THE CHASE NATIONAL BANK OF THE CITY OF NEW YORK, as Corporate Trustee, and Another, Plaintiffs, *v.* CLARK HENRY CORPORATION and PEOPLE OF THE STATE OF NEW YORK, Defendants, ALVIN J. SCHLOSSER and Others, as a Committee, Intervening Defendants.

NATALIE HABER and IRVING WIENER, Suing on Behalf of Themselves and All Other Holders of Bonds Similarly Situated, Executed by the CLARK HENRY CORPORATION, Who Care to Join in and Contribute to the Expense of This Action, Plaintiffs, *v.* THE CHASE NATIONAL BANK OF THE CITY OF NEW YORK, as Trustee, under an Indenture, Dated November 1, 1928, and Executed as Security for the Payment of a Bonded Indebtedness of the CLARK HENRY CORPORATION, Defendant.

Supreme Court, Kings County, October 1, 1935.

*Mudge, Stern, Williams & Tucker* [*Joseph V. Kline* and *John Wallis* of counsel], for the plaintiff Chase National Bank.

*Yetta Y. Schenker,* for the plaintiff Greenbaum.

*Harris J. Griston,* for the plaintiffs Haber and Wiener.

*Van Vorst, Siegel & Smith* [*Alexander B. Siegel* of counsel], for the defendant Clark Henry Corporation.

*Frueauff, Robinson & Sloan* [*Joseph M. Proskauer* and *Bernard M. Shanley* of counsel], for Schlosser and others, intervening defendants.

*Rabenold & Scribner* [*Mark Hyman* of counsel], for Buckingham committee.

*Barr, Bennett & Fullen, Archibald Palmer, Jacob M. Friedman, H. Paul Shanik, McLaughlin & Stern* and *Milton Eisenberg,* for various bond certificate holders.

LOCKWOOD, J. The St. George Hotel property which occupies the square block bounded by Clark, Hicks, Pineapple and Henry streets, on Brooklyn Heights, on November 1, 1928, became subject to a first mortgage Series A, five and three-quarters per cent bond issue in the sum of $8,000,000. Interest on these bonds, which had been sold to the general public, was paid regularly until May 1, 1933, when there was a default. At that time the amount of this mortgage bond issue outstanding was, and still is, $7,990,000.

An assignment of rents to the Chase National Bank, the corporate trustee, was executed and delivered May 16, 1933, and on May 24, 1933, the said trustee instituted foreclosure proceedings.

Shortly thereafter the so-called Schlosser bondholders' committee was formed, and in November of the same year the Buckingham bondholders' committee was organized.

The parties were brought before this court in March, 1934, when the motions of the Schlosser committee for leave to intervene in the foreclosure action and for the court to assume jurisdiction over plans of reorganization of the Hotel St. George property were granted.

During the spring, summer and fall of 1934 and during 1935 many hearings and conferences were held by the court, with members of the bondholders' committees, counsel for the committees and attorneys representing groups of bondholders who had not deposited with either committee.

The Supreme Court in New York county in November, 1934, ordered actions there brought for accountings against the trustees consolidated with the proceedings then pending in Kings county, where the property was located. Hearings were afterwards held in these accounting actions, and they were here decided.

A plan of reorganization approved by all the conferees was finally agreed upon, the necessary documents and statements prepared and submitted to and considered by the Federal Securities Commission at Washington, D. C., and subsequently forwarded to the bondholders, with the result that of the outstanding $7,990,000 in bonds, $7,158,700 were deposited with the Schlosser committee

and $510,600 were deposited with the Buckingham committee, a total of $7,669,300, or about ninety-six per cent of the bonds outstanding.

A brief analysis of plan follows: (a) Due date of mortgage bonds extended for fifteen years. (b) Bondholders retain first mortgage security for the full amount of their bonds. (c) The new bonds bear fixed interest at the rate of four per cent per annum payable semi-annually. (d) A guaranty fund of approximately $174,000 in cash is being deposited with the trustee, to be used to pay bond interest in case the current earnings fall below interest charges. (e) After payment of operating expenses, taxes and interest, if there be surplus earnings available, such earnings up to approximately $174,000 per year to be used to retire and pay off bonds. (f) $350,000 in cash is being provided by the new ownership group for which they receive stock of the new company, unsecured four per cent income debentures, all of which come after and are subordinate to the new first mortgage bonds. (g) Assenting bondholders, in addition to receiving dollar for dollar in fixed interest bonds, will be paid in full for all past due interest on their old bonds at the rate of four per cent per annum; partly in cash and the balance in additional first mortgage bonds at the rate of one dollar and fifty cents for each one dollar unpaid interest. (h) Fifty thousand dollars is being provided in cash for the hotel, to be used as working capital. (i) In addition to the usual repairs, $150,000 is being expended in modernization and improvements.

Pursuant to court order, the property was advertised for sale under foreclosure proceedings and was sold September 5, 1935, and bid in by the Schlosser committee on behalf of the assenting bondholders, for the upset price fixed by the court, $2,500,000.

In May, 1935, the trustee filed a petition with this court, setting forth in detail the physical condition of the hotel property, showing that some of the buildings in the eight units comprising the property were erected as long ago as 1884, and pointing out that in order for the property to maintain its prestige and continue economical and profitable operation, it was necessary to make substantial repairs and modern improvements to the lobby and other portions of several of the units, in all at a cost of upwards of $200,000, and that in due course such improvements should be made during the summer months — the slack period of hotel operations.

After investigation and examination by the court and by experts appointed by it, who have during the last previous eighteen months made several detailed surveys of the property and of its earnings and operations, the court with the consent of all who have appeared in the proceeding, except the corporate and individual trustees,

who neither consented nor objected, authorized the expenditure of $150,000 for modernization and improvements, which work is under contract and under way.

There is now before this court for decision a motion for the fixation and approval of the expenses and fees of the reorganization committees, the trustees, their counsel and the attorneys for the independent bondholders, the accountants and the experts appointed by the court, with the approval of all who have appeared. This motion is, in effect, one for the allocation or disposition of the available funds.

The following is a statement of the moneys expected to be in hand and of the expenses to be met as of October 1, 1935 (these items are estimated):

| | |
|---|---:|
| Cash with the trustee, being the balance in its possession from the moneys received by it under the assignment of net income, made May 16, 1933............ | $537,000 00 |
| To be paid by the underwriters when their new company takes title October 1, 1935................. | 350,000 00 |
| Total amount available....................... | $887,000 00 |

From this sum the following payments must be made:

To the United States government:

| | |
|---|---:|
| Federal tax on transfer of old bonds to new company | $3,000 00 |
| Documentary stamps on deed................... | 2,500 00 |
| Federal original issuance tax on new bonds........ | 8,700 00 |
| Federal original issuance tax on new stock and new debentures................................. | 360 00 |
| New York State mortgage tax on new mortgage to secure the new bonds........................ | 43,500 00 |

To the city of New York:

| | |
|---|---:|
| Real estate taxes for July, August and September, 1935....................................... | 51,000 00 |
| Sales tax on furniture and other equipment in the hotel...................................... | 4,400 00 |
| To county officials for recording documents......... | 500 00 |
| Foreclosure expenses (advertising notice of sale)..... | 1,474 65 |
| Working capital for the new company under the terms of the plan of reorganization.................... | 50,000 00 |
| Cash to be paid to new company representing excess of current liabilities over assets.................. | 50,000 00 |
| Guaranty fund for interest on the new bonds under the provisions of the plan of reorganization........... | 174,000 00 |

Payment to bondholders who have either dissented or not consented to the plan of reorganization under the terms of the plan and under the terms of the court order the holders of these bonds — total amount $320,000 — are to be paid out at about $38 per hundred, on the basis of the fixed upset price of $2,500,000, which is also the amount of the sale price, plus the amount of the net accumulated income, less foreclosure charges, in the hands of the trustee — total payment to these bondholders.... $122,000 00

Unpaid printing bills........................................ 1,315 00

Reserved to pay the following expected charges:

For additional printing, postage, mailing, accounting, stenographic and miscellaneous items...... 6,500 00

For printing new bonds........................ 2,500 00

Title insurance.............................. 8,500 00

Printing new trust mortgage and debenture agreement.................................. 2,500 00

Trustee's fees for authenticating, checking and signing the new securities, to be increased to standard charges if there is surplus in reserve for expenses 5,000 00

Trustee's new counsel, for examining and passing upon the legal papers and closing title.......... 2,000 00

Total estimated necessary expenses (these items are not only to be certified by the committee and counsel, but are subject to audit and check by the court)............................ $539,749 65

Leaving available to pay on account of back interest to bondholders who have received no interest since November 1, 1932, and for committee and other expenses and legal fees........................ 347,250 35

The requests for expenses, attorneys' fees and disbursements filed with the court are:

Expenses..................................... $68,456 87

Fees......................................... 474,750 00

Or a total of.............................. $543,206 87

As the amount requested exceeds the estimated total sum on hand by about $196,000, it is at once apparent that it is impossible to grant the requests.

The general rule is that reorganization committees and attorneys, in the absence of definite agreements, deserve compensation accord-

ing to the reasonable worth of their services. To arrive at the value of such services the court may consider the nature of the services rendered, the standing and experience of the committee members in the business world, and of the attorneys in their profession, for learning, skill and proficiency, the amount involved and its importance to those benefited, and the results accomplished.

This proceeding affects the outstanding hotel property in the borough of Brooklyn, with a total of mortgage bonds of upwards of $8,000,000. The committee members are leaders in real estate, financial and business circles and the attorneys, among the foremost at the bar, with long experience in reorganizations.

All the attorneys and the chairman of the Schlosser committee put forth much effort to bring about this reorganization; unquestionably, their services are of substantial value to the property.

At this point, it is but fair to state that this court gave a large amount of time, since March, 1934, to Hotel St. George matters and contributed to the consummation of this plan, which in important respects differs from the one originally submitted.

Counsel point out that the assenting bondholders in making the exchange of their old bonds for the new bonds, are receiving better security in that the property has been improved during the last two years by substantial sums spent for maintenance, that $150,000 is now being expended on the modernization hereinbefore referred to, that the new company is being allowed $50,000 of new capital out of the accumulated income and that a new guaranty fund of $174,000 has been created to provide for the payment of interest in the event that the earnings are insufficient.

While these provisions to protect the investment of these 4,000 bondholders have all been made with a view of strengthening the plan and with the hope that business will improve and the reorganization will work out successfully, it must be borne in mind that these bondholders are generally people of small means and that they have had no interest since November 1, 1932.

Furthermore, the plan of reorganization, dated September 28, 1934, which was issued to bondholders and to the public, stated " bondholders depositing under this plan, in addition to receiving dollar for dollar principal in new bonds will also be paid in full for all past due and accumulated interest on their old securities at the rate of four per cent per annum. Such payment will be made in cash to the extent that funds available for reorganization are sufficient and for any unpaid balance of interest which may remain after using all available cash, payment will be made in the form of additional new bonds at the rate of $1.50 principal amount new bonds for each $1 of unpaid interest."

A number of letters sent out by the bondholders' committees contain similar statements.

If this means anything, it means that at the time it was issued, all who participated in the promulgation of the plan expected there would be a partial payment in cash against back interest to the bondholders and likewise depositing bondholders must have had the same understanding, and relied upon it when, to so large a number, they agreed to the plan of reorganization.

This pledge must be kept and it can be kept only by giving the bondholders (whose rights, as pointed out by the Appellate Division of the Supreme Court in this department, in a similar reorganization case [*Clinton Trust Co.* v. *142–144 Joralemon Street Corporation*, 237 App. Div. 789], are paramount) part of the back interest in cash. This means that the committees, trustees and the attorneys' requests for compensation must necessarily be drastically reduced.

The Chase National Bank, the corporate trustee, asks $40,000.

When this trustee took the assignment of net income in May, 1933, it selected accountants to supervise the hotel operation. Said accountants have been paid out of the income at the rate of $13,800.

The corporate trustee also selected counsel, who have presented a separate bill.

These accountants and attorneys must have done most of the work for the corporate trustee. Allowance, $10,000; disbursements, $1,796.03.

Mudge, Stern, Williams & Tucker, attorneys for the corporate trustee, conducted the foreclosure and participated in reorganization conferences and proceedings. They ask $65,000, which with the $10,000 heretofore paid them on account by the trustee, makes $75,000. Whether fees of the size demanded may be allowed to plaintiff's attorneys in a foreclosure action may be open to question, but the court has decided to put these attorneys in the same favorable position as the others. Total allowance, $22,500; paid on account, $10,000; balance, $12,500; disbursements, $1,915.86.

M. Ernest Greenbaum, individual trustee, asks $15,000 fee and $83 disbursements. Mr. Greenbaum had little responsibility, as the assignment of rents was made to the corporate trustee only. He aided the reorganization but, as a member of one of the houses that floated the original bond issue, the court feels he was under a duty to help investors to whom his firm sold these bonds. Allowance, including disbursements, $1,000.

The attorney for the individual trustee co-operated fully; payment of $5,000 on account of services has been made. An additional $25,000 is asked. Allowance, including disbursements, $7,500; having received $5,000; additional $2,500.

The depositary for the Schlosser committee, Halsey Stuart & Company, Inc., and Pennsylvania Company for Insurance on Lives and Annuities as subdepositary, and Trust Company of North America, ask a total fee of $37,000. Halsey Stuart & Company, Inc., with whom the greater amount of bonds were deposited, is another house that marketed the original bond issue. Again the court feels that it owes a duty to stand by the people to whom it sold these securities and here its charges surely should not exceed its expenses. Allowance to cover charges of all three depositaries, $15,000.

The so-called Schlosser bondholders' committee asks $50,000 for services. Of the seven members of the committee, the chairman, Alvin J. Schlosser, was continuously active and contributed largely to bringing about the reorganization. These men are all interested in the progress of the borough of Brooklyn and the success or failure of this enterprise is of importance to Brooklyn and to them. Therefore, it is necessary to ask men with knowledge and experience to contribute some of their time for the public good. The court appreciates that the allowances to them are nominal. Mr. Schlosser's work has been outstanding for he has carried the heaviest burden throughout. However, he is with Halsey Stuart & Company, Inc., and the allowance to him cannot be the same as it would be if his firm had had no prior connection with the property. Allowances: Alvin J. Schlosser, $5,000; Joseph W. Dixon, $1,000; Sylvan Gotshal, $1,000; William M. Greve, $1,000; William T. Hunter, $1,000; George V. McLaughlin, $1,000; Douglas Vought, $1,000.

As to allowances for disbursements made by the Schlosser committee, $46,501.35, and by the Buckingham committee, $14,628.89, the court has not had sufficient time to have the items audited and checked; therefore, these sums will be held in reserve until they can be passed upon.

Frueauff, Robinson & Sloan, attorneys for the Schlosser committee, ask $100,000 for their services, including the services of counsel, and $2,681.91 for disbursements. Unquestionably this firm performed the major part of the legal work; their Mr. Shanley has devoted his time to the matter since it came before this court and the special counsel for the committee — Hon. Joseph M. Proskauer — has frequently appeared. He supervised the preparation of all the documents and other legal papers, took the lead at the conferences and in the court arguments. The amount allowed them has necessarily had to be reduced to a very reasonable figure because of the amount available for distribution, $37,500. Disbursements, $2,681.91.

The Buckingham committee and Rabenold & Scribner, attorneys — Mark Hyman, as counsel — ask $60,000 fees and $14,628.89 disbursements. This committee consists of three members and had a total of $510,800 bonds deposited with it. Its counsel, Mr. Hyman, devoted a large amount of time to this matter. The amount they ask for is out of the question. Allowance to Lee S. Buckingham $1,000; Wayne G. Fahnestock, $750; Alfred J. Stern, $500. To the attorneys and their counsel, a total of $12,000.

Harris, Kerr, Cook & Forster, for accounting work in connection with the registration with the Federal Securities Commission. Amount asked $1,000. In view of the fact that they have been paid for general accounting services and other special work the allowance is $500.

Barr, Bennett & Fullen, attorneys for independent bondholders, ask $500 for services and disbursements, a most modest request, which $500 is allowed.

The following attorneys for independent bondholders all gave much of their time and effort to the reorganization plan and attended court hearings. However, the amounts they ask for are more than can be allowed for the reason heretofore frequently stated. Archibald Palmer asks $10,000; allowance $1,500; Jacob A. Friedman asks $15,000; allowance $1,500. Harris J. Griston asks $7,650 and $2,500 for accounting fees. No accounting was necessary for, as the court pointed out in advance, the services of the accountants employed by the hotel, the corporate trustee and the committees and of the experts designated by the court with the approval of all counsel, were available to all the attorneys. Allowance, $1,000. H. Paul Shanik asks $5,000; allowance $1,000. McLaughlin & Stern ask $10,000. In addition to usual work, prepared the briefs and negotiated with the title insurance companies to obtain title insurance after the reorganization; allowance, $3,000. Milton Eisenberg leaves the matter of his fee to the court; allowance $1,500.

With the approval of all of the counsel, the court in April, 1934, designated a committee of three experts: Edward H. Crandall, who had operated many large hotels in Brooklyn and New York and who was then operating Mayfair House, Hotel Pierre and the Westchester-Biltmore, a recognized hotel expert who has acted in an advisory capacity to the Reconstruction Finance Corporation and other government agencies; Ernest P. Horwath of the firm of Horwath & Horwath, one of the leading hotel accountants of the United States, acting in that capacity for over sixty large hotels, and publishers of monthly hotel statistical service, and Nathaniel L. Goldstein, an attorney experienced in reorganization matters, who, as part of his legal education, became a certified public account-

ant. All three performed good service, but Mr. Goldstein was called upon to actively participate in the reorganization work throughout in all its phases and is acting as chairman of the special reorganization committee which will not complete its work for three or four months. His work was commended to the court by the committee representatives and all the attorneys. To date he has devoted some 600 hours to the work, which included night and Sunday work. Allowances: Mr. Crandall asks $4,250. He has had $500; additional allowance $2,000. Mr. Horwath asks $3,000; allowance $2,500. Mr. Goldstein has left his compensation to the conferees and the court; allowance, to cover disbursements and the work still to be done, $9,500.

Joseph J. Baker, referee to compute and sell in foreclosure, $2,000.

Crews & Shapiro, auctioneers, selling real and personal property, $350.

RECAPITULATION

| | | |
|---|---:|---:|
| Cash with trustee | $537,000 00 | |
| From underwriters | 350,000 00 | |
| Total on hand | | $887,000 00 |
| Estimated for United States, State and city taxes, reserves, etc | $193,749 65 | |
| To pay non-assenting bondholders | 122,000 00 | |
| Interest guaranty fund | 174,000 00 | |
| For working capital | 50,000 00 | |
| Total | | 539,749 65 |
| Difference | | $347,250 35 |
| **Deduct allowances:** | | |
| Trustees of mortgage | $11,000 00 | |
| Depositaries | 15,000 00 | |
| Bondholders' committees | 13,250 00 | |
| Referee to compute and sell and auctioneers | 2,350 00 | |
| Experts appointed by court | 14,000 00 | |
| Fees of all attorneys ($89,500, less paid on account, $15,000) | 74,500 00 | |
| Total allowance for fees | | $130,100 00 |
| Expenses allowed | $6,893 80 | |
| Reserved for expenses of committees, to be audited and allowed by court | 58,407 07 | |
| Total | | 65,300 87 |
| | | $195,400 87 |

$195,400.87 deducted from $347,250.35 gives a total of $151,849.48.

This balance, plus any amount which may be saved from the reserves heretofore set up for expenses, would be available for cash distribution to bondholders on account of unpaid interest.

The stenographer's minutes of the proceedings had before this court since March, 1934, and the affidavits submitted on this motion are hereby made part of this record, together with this memorandum.

This motion to fix fees and allowances was brought on by order to show cause obtained in Special Term, Part II, and made returnable before this court at the request of the moving parties, and is passed upon as aforesaid.

Order signed.